# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF MICHIGAN
# SOUTHERN DIVISION

Edwin Anderson, individual, Alline Anderson, individual, Leroy Blassingame, individual, Mary Blassingame, individual, Deneesha Bobo, individual, Beatrice Boler, individual, Kalisha Bishop, individual, James Blakely, individual, Mary Blakely, individual, Robert Boyler, II, individual, Robert Boyler, Sr., individual, Alvin Brantley, individual, Marilyn Brayson, individual, Ray Brayson, individual, Lance Brooks, individual, Jamie Brooks, individual, David Brown, individual, Kelly Brown, individual, Ruth Bryant, individual, Lillian Chandler, individual, Lillian Chandler, as next friend of Karman Neal & Aubrey Neal, Richard Curtis, individual, Chaun Dean, individual, Marc Dean, individual, Leon El-Alamin, Sr., individual, Leon El-Alamin, Sr., as next friend of Leon El-Alamin, Jr., Margaret Fralick, individual, Belvain Fuller, individual, Charlie Harris, individual, Charlie Harris, as next friend of Carmelo J. Harris, Charlie Harris, Jr., individual, Veda Harris, individual, Veda Harris, Individual, Cecil Hoskins, individual, Marva Hoskins, individual, Louis Hubbard, individual, Gloria Jones, individual, Ann Kaufeld, individual, William Scott Kincaid, individual, Hilda Mathus, individual, Sylvester Obb, Jr., individual, Embery Pope, individual, Juanell Rice, individual, Elena Richardson, individual, Elena Richardson, as next friend of Messiah, Makari and Makiah Richardson, Helene Saldana, individual, Helene Saldana, as next friend of Tabitha, Amber and Crystal Saldana, Javier Saldana, individual, Muriel Samuels, individual, Jeremy Seniff, individual, Leo Seniff, individual, Kathleen Seniff, individual, Larry Shears, individual, Faith Timmons, individual, Faith Timmons as next friend of Olivia Timmons, Gregory Timmons, individual, Gregory Timmons, as next friend of Gregory Timmons, II, Sandra Walker-Pope, individual, Lamar Washington, Individual, Fredie Williams, individual, Shirley Williams, individual, Lillie Wilson, individual, Harold Woodson, individual, Deidre Woodson, individual, and Maya Woodson, individual,

   *Plaintiffs*,

  v.

Case No.

Honorable

Magistrate

United States of America, United States
Environmental Protection Agency,

     *Defendant.*

**MASS TORT COMPLAINT AND DEMAND FOR TRIAL BY JURY**

  NOW COME, the above named Plaintiffs, in their individual and representative capacities, as outlined above and herein, by and through their Attorneys of Record, Washington Legal by Valdemar L. Washington, and bring this action for damages to their persons and property, and complain of Defendant as follows:

<u>**Introduction**</u>

1. This Federal Tort Claims Action ("FTCA") for personal and property damages is brought by Plaintiffs against the United States of America, the United States Environmental Protection Agency ("EPA") for its role in creating and exacerbating the contamination of Plaintiffs drinking water supply, now commonly known as the Flint Water Crisis, under the FTCA, 28 U.S.C. § 2671 *et seq.*

2. The EPA failed to follow several specific agency mandates and directives governing its conduct which resulted in injury to Plaintiffs. Upon notice of a contaminant in the water system which presents a substantial and imminent danger, the EPA is required to first determine whether the state and local agency is taking timely action protective of public health.  If timely and protective action is not being taken, the EPA is required to bring a Section 1431 emergency action.  However, despite notice of the danger as early as October 2014, the EPA failed to take the mandatory steps to determine that Michigan and Flint authorities were not taking appropriate action to protect the public from toxic water and failed to file the emergency Section 1431 action until January 2016.

3.      In addition, the EPA is required to provide advice and technical assistance to states and local providers, which are not in compliance with the requirements of the Safe Drinking Water Act ("SDWA") and if compliance is not achieved in thirty days, the EPA is required to issue an order or commence a civil action to obtain compliance.  The EPA took none of those mandatory steps.  The failure to fulfill these mandatory duties constitutes violations of the FTCA.

4.      Plaintiffs are all residents of, and/or property owners within the City of Flint who, from April 25, 2014, to the present have suffered, and will continue to experience serious personal injury, personal property and real property damage caused by the Defendants' actions as set forth herein.

5.      Defendant EPA, through its employees was negligent in its actions before and after the April 25, 2014 decision to substitute safe water supplied by the City of Detroit to Flint water and sewer customers, with the highly corrosive and hazardous water from the Flint River.

6.      As early as 2011, it was known that use of the Flint River as the public source of water without proper anti-corrosive treatment would create a condition dangerous to health and property.

7.      Defendant EPA, was the professional agency and staff its members responsible for providing guidance, support and oversite to the persons and agencies responsible for ensuring that the State of Michigan and the City of Flint complied with all requirements of the SDWA.  Due to their failure to act or their failure to act appropriately and timely, the citizens of Flint in general and Plaintiffs in particular, suffered and continue to suffer both personal bodily injury, real property, and personal property damages.

8.      Defendant EPA, through its employees committed acts or failed to act while employees of the government and as a consequence failed to exercise due care in the execution of a statute or regulation as required by 28 USC § 2680(a).

9.      The claims against Defendant are not based upon the performance or failure to perform a discretionary function or duty by its employees under 28 USC § 2680(a).

10.     Defendant EPA's employees knew that to safely supply the Flint water customers with potable water from the Flint River that substantial and significant upgrades and improvements had to be made to the Flint Water Treatment Plant.

11.     Defendant EPA's employees knew that those substantial and significant upgrades and improvements had not been made before April 25, 2014 and failed to so advise the Flint water customers of the unsafe nature of their drinking water.

12.     Within days of the introduction of Flint River water into the Flint water delivery system pipelines, the noxious sight, taste, and smell of water flowing from the taps was apparent. Defendant EPA's employees ignored the initial irrefutable evidence that the water that was being distributed to the City of Flint was highly corrosive, not fit for human consumption and dangerous for human use and exposure.

13.     During the months following April 25, 2014, evidence mounted that the Flint River water was not only unfit for human consumption, and use, but was toxic and unsafe, causing lead poisoning of Plaintiffs and their children, and other serious medical conditions.

14.     On or around late 2014 or early 2015 a report disclosed a dramatic spike in elevated blood lead levels in Flint's youngest children as measured by State epidemiologists, with the upward spike coinciding precisely with the time frame that Flint's children

were exposed to the Flint River water in their homes, schools and other public locations.

15.     Also by late 2014 or early 2015, further evidence of the toxicity of Flint's water was revealed in water samples showing extraordinarily high levels of lead, as well as dangerously high levels of Trihalomethanes, coliform, E. Coli and other bacteria.

**Jurisdiction and Venue**

16.     Plaintiffs incorporate by reference and make a part hereof all previous paragraphs as though they were fully set forth herein.

17.     Plaintiffs are residents of, and/or property owners within the City of Flint, Genesee County, Michigan, and were at all relevant times exposed to Flint's contaminated water supply.

18.     This Court has personal jurisdiction over Defendant because the negligent and wrongful conduct of Defendant as alleged in this lawsuit occurred in the State of Michigan, County of Genesee, City of Flint, and the amount in controversy is in excess of $75,000.00.

19.     Venue is proper in this Court because the Federal Tort Claims Act is the exclusive remedy in which a person may sue the United State Government or any of its various agencies and employees for monetary damages. *See* 28 USC § 2679.

20.     The United States District Court for the area where the injury occurred is the exclusive forum in which the United States can be sued. *See* 28 USC § 1346(b). The negligent and wrongful conduct and original injury and damage occurred in Genesee County, Michigan and this Court has jurisdiction over acts that occur in Genesee County, Michigan.

21.     This Court has jurisdiction over a Federal Tort Claims Act action, but must apply the law of the state where the acts or omissions occurred.  *See* 28 USC § 1346.

22.     This action is timely filed within the rules of 28 USC § 2401(b), and §2675(a).  All administrative remedy actions have been complied with and exhausted.

## The Parties

**A.      Plaintiffs**

23.     Plaintiffs incorporate by reference and make a part hereof all previous paragraphs as though they were fully set forth herein.

24.     Plaintiff Edwin Anderson is an adult, married resident of Flint who was exposed to toxic and contaminated water from the FWTP starting on April 25, 2014 and continuing to date who has suffered injuries to person and property as a result of said exposure.

25.     Plaintiff Alline Anderson is an adult, married resident of Flint who was exposed to toxic and contaminated water from the FWTP starting on April 25, 2014 and continuing to date who has suffered injuries to person and property as a result of said exposure.

26.     Plaintiff James Blakely is an adult, married resident of Flint who was exposed to toxic and contaminated water from the FWTP starting on April 25, 2014 and continuing to date who has suffered injuries to person and property as a result of said exposure.

27.     Plaintiff Mary Blakely is an adult, married resident of Flint who was exposed to toxic and contaminated water from the FWTP starting on April 25, 2014 and continuing to date who has suffered injuries to person and property as a result of said exposure.

28.     Plaintiff Leroy Blassingame is an adult, married resident of Flint who was exposed to toxic and contaminated water from the FWTP starting on April 25, 2014 and continuing to date who has suffered injuries to person and property as a result of said exposure.

29.     Plaintiff Mary Blassingame is an adult, married resident of Flint who was exposed to toxic and contaminated water from the FWTP starting on April 25, 2014 and continuing to date who has suffered injuries to person and property as a result of said exposure.

30.     Plaintiff Deneesha Bobo is an adult resident of Flint who was exposed to toxic and contaminated water from the FWTP starting on April 25, 2014 and continuing to date who has suffered injuries to person and property as a result of said exposure.

31.     Plaintiff Beatrice Boler is an adult, married resident of Flint who was exposed to toxic and contaminated water from the FWTP starting on April 25, 2014 and continuing to date who has suffered injuries to person and property as a result of said exposure.

32.     Plaintiff Beatrice Boler, as next friend of Kalisha Bishop is an adult, married resident of Flint who brings this action on behalf of her minor daughter Kalisha Bishop who was exposed to toxic and contaminated water from the FWTP starting on April 25, 2014 and continuing to date who has suffered injuries to person as a result of said exposure.

33.     Plaintiff Robert Boyler, II is an adult resident of Flint who was exposed to toxic and contaminated water from the FWTP starting on April 25, 2014 and continuing to date who has suffered injuries to person and property as a result of said exposure.

34.     Plaintiff Robert Boyler, Sr. is an adult resident of Flint who was exposed to toxic and contaminated water from the FWTP starting on April 25, 2014 and continuing to date who has suffered injuries to person and property as a result of said exposure.

35.     Plaintiff Alvin Brantley is an adult resident of Flint who was exposed to toxic and contaminated water from the FWTP starting on April 25, 2014 and continuing to date who has suffered injuries to person and property as a result of said exposure.

36.     Plaintiff Marilyn Brayson is an adult, married resident of Flint who was exposed to toxic and contaminated water from the FWTP starting on April 25, 2014 and continuing to date who has suffered injuries to person and property as a result of said exposure.

37.     Plaintiff Ray Brayson is an adult, married resident of Flint who was exposed to toxic and contaminated water from the FWTP starting on April 25, 2014 and continuing to date who has suffered injuries to person and property as a result of said exposure.

38.     Plaintiff Lance Brooks is an adult, married resident of Flint who was exposed to toxic and contaminated water from the FWTP starting on April 25, 2014 and continuing to date who has suffered injuries to person and property as a result of said exposure.

39.     Plaintiff Jamie Brooks is an adult, married resident of Flint who was exposed to toxic and contaminated water from the FWTP starting on April 25, 2014 and continuing to date who has suffered injuries to person and property as a result of said exposure.

40.     Plaintiff David Brown is an adult, married resident of Flint who was exposed to toxic and contaminated water from the FWTP starting on April 25, 2014 and continuing to date who has suffered injuries to person and property as a result of said exposure.

41.     Plaintiff Kelly Brown is an adult, married resident of Flint who was exposed to toxic and contaminated water from the FWTP starting on April 25, 2014 and continuing to date who has suffered injuries to person and property as a result of said exposure.

42.     Plaintiff Ruth Bryant is an adult resident of Flint who was exposed to toxic and contaminated water from the FWTP starting on April 25, 2014 and continuing to date who has suffered injuries to person and property as a result of said exposure.

43. Plaintiff Lillian Chandler is an adult, married resident of Flint who was exposed to toxic and contaminated water from the FWTP starting on April 25, 2014 and continuing to date who has suffered injuries to person and property as a result of said exposure.

44. Plaintiff Lillian Chandler, as next friend of Karman Neal and Aubrey Neal is an adult, married resident of Flint who brings this action on behalf of her minor granddaughters Karman Neal and Aubrey Neal who were exposed to toxic and contaminated water from the FWTP starting on April 25, 2014 and continuing to date who have suffered injuries to their persons as a result of said exposure.

45. Plaintiff Richard Curtis is an adult resident of Flint who was exposed to toxic and contaminated water from the FWTP starting on April 25, 2014 and continuing to date who has suffered injuries to person and property as a result of said exposure.

46. Plaintiff Chaun Dean is an adult resident of Flint who was exposed to toxic and contaminated water from the FWTP starting on April 25, 2014 and continuing to date who has suffered injuries to person and property as a result of said exposure.

47. Plaintiff Marc Dean, is now an adult resident of Flint who was exposed to toxic and contaminated water from the FWTP starting on April 25, 2014 and continuing to date who has suffered injuries to his person as a result of said exposure.  At the time of filing his initial administrative complaint, it was filed by his mother, Chaun Dean on his behalf as her minor child.

48. Plaintiff Leon El-Alamin, Sr. is an adult resident of Flint who was exposed to toxic and contaminated water from the FWTP starting on April 25, 2014 and continuing to date who has suffered injuries to person and property as a result of said exposure.

49.     Plaintiff Leon El-Alamin, Sr., as next friend of Leon El-Alamin, Jr. is an adult resident of Flint who brings this action a behalf of his minor son, Leon El-Alamin, Jr., who was exposed to toxic and contaminated water from the FWTP starting on April 25, 2014 and continuing to date who has suffered injuries to person as a result of said exposure.

50.     Plaintiff Margaret Fralick is an adult, married resident of Flint who was exposed to toxic and contaminated water from the FWTP starting on April 25, 2014 and continuing to date who has suffered injuries to person and property as a result of said exposure.

51.     Plaintiff Belvain Fuller is an adult resident of Flint who was exposed to toxic and contaminated water from the FWTP starting on April 25, 2014 and continuing to date who has suffered injuries to person and property as a result of said exposure.

52.     Plaintiff Charlie Harris is an adult, married resident of Flint who was exposed to toxic and contaminated water from the FWTP starting on April 25, 2014 and continuing to date who has suffered injuries to person and property as a result of said exposure.

53.     Plaintiff Charlie Harris, as next friend of Carmelo J. Harris, is an adult, married resident of Flint who brings this action on behalf of his minor son, Carmelo J. Harris, who was exposed to toxic and contaminated water from the FWTP starting on April 25, 2014 and continuing to date who has suffered injuries to his person as a result of said exposure.

54.     Plaintiff Charlie Harris Jr. is now an adult married resident of Flint who was exposed to toxic and contaminated water from the FWTP starting on April 25, 2014 and continuing to date who has suffered injuries to his person as a result of said exposure.  At the time of filing his initial administrative complaint, it was filed by his mother, Veda Harris on his behalf as her minor child.

55.    Plaintiff Veda Harris is an adult, married resident of Flint who was exposed to toxic and contaminated water from the FWTP starting on April 25, 2014 and continuing to date who has suffered injuries to person and property as a result of said exposure.

56.    Plaintiff Cecil Hoskins is an adult resident of Flint who was exposed to toxic and contaminated water from the FWTP starting on April 25, 2014 and continuing to date who has suffered injuries to person and property as a result of said exposure.

57.    Plaintiff Louis Hubbard is an adult resident of Flint who was exposed to toxic and contaminated water from the FWTP starting on April 25, 2014 and continuing to date who has suffered injuries to person and property as a result of said exposure.

58.    Plaintiff Gloria Jones is an adult, married resident of Flint who was exposed to toxic and contaminated water from the FWTP starting on April 25, 2014 and continuing to date who has suffered injuries to person and property as a result of said exposure.

59.    Plaintiff Ann Kaufeld is an adult resident of Flint who was exposed to toxic and contaminated water from the FWTP starting on April 25, 2014 and continuing to date who has suffered injuries to person and property as a result of said exposure.

60.    Plaintiff William Scott Kincaid, is an adult, married resident of Flint who was exposed to toxic and contaminated water from the FWTP starting on April 25, 2014 and continuing to date who has suffered injuries to person and property as a result of said exposure.

61.    Plaintiff Hilda Mathus is an adult resident of Flint who was exposed to toxic and contaminated water from the FWTP starting on April 25, 2014 and continuing to date who has suffered injuries to person and property as a result of said exposure.

62.     Plaintiff Sylvester Obb, Jr. is an adult, married resident of Long Beach, California who is the owner of the real property located at 257 E. York Avenue in the City of Flint, that was exposed to toxic and contaminated water from the FWTP starting on April 25, 2014 and continuing to date who has suffered injuries to property as a result of said exposure.

63.     Plaintiff Embery Pope is an adult, married resident of Flint who was exposed to toxic and contaminated water from the FWTP starting on April 25, 2014 and continuing to date who has suffered injuries to person and property as a result of said exposure.

64.     Plaintiff Juanell Rice is an adult resident of Flint who was exposed to toxic and contaminated water from the FWTP starting on April 25, 2014 and continuing to date who has suffered injuries to person and property as a result of said exposure.

65.     Plaintiff Elena Richardson is an adult resident of Flint who was exposed to toxic and contaminated water from the FWTP starting on April 25, 2014 and continuing to date who has suffered injuries to person and property as a result of said exposure.

66.     Plaintiff Elena Richardson, as next friend of her three children, Messiah Richardson, Makari Richardson, and Makiah Richardson, is an adult resident of Flint who brings this action on behalf of her three minor children, Messiah Richardson, Makari Richardson and Makiah Richardson, who were exposed to toxic and contaminated water from the FWTP starting on April 25, 2014 and continuing to date who have suffered injuries to their persons as a result of said exposure.

67.     Plaintiff Helene Saldana is an adult, married resident of Flint who was exposed to toxic and contaminated water from the FWTP starting on April 25, 2014 and continuing to date who has suffered injuries to person and property as a result of said exposure.

68.    Plaintiff Helene Saldana, as next friend of Tabitha Saldana, Amber Saldana and Crystal Saldana, is an adult, married resident of Flint who brings this action on behalf of her three minor children, Tabitha Saldana, Amber Saldana and Crystal Saldana, who were exposed to toxic and contaminated water from the FWTP starting on April 25, 2014 and continuing to date who have suffered injuries to their persons as a result of said exposure.

69.    Plaintiff Javier Saldana is an adult, married resident of Flint who was exposed to toxic and contaminated water from the FWTP starting on April 25, 2014 and continuing to date who has suffered injuries to person and property as a result of said exposure.

70.    Plaintiff Muriel Samuels is an adult resident of Flint who was exposed to toxic and contaminated water from the FWTP starting on April 25, 2014 and continuing to date who has suffered injuries to person and property as a result of said exposure.

71.    Plaintiff Jeremy Seniff is an adult resident of Flint who was exposed to toxic and contaminated water from the FWTP starting on April 25, 2014 and continuing to date who has suffered injuries to person and property as a result of said exposure.

72.    Plaintiff Leo Seniff is an adult, married resident of Flint who was exposed to toxic and contaminated water from the FWTP starting on April 25, 2014 and continuing to date who has suffered injuries to person and property as a result of said exposure.

73.    Plaintiff Kathleen Seniff is an adult, married resident of Flint who was exposed to toxic and contaminated water from the FWTP starting on April 25, 2014 and continuing to date who has suffered injuries to person and property as a result of said exposure.

74. Plaintiff Larry Shears is an adult, married resident of Flint who was exposed to toxic and contaminated water from the FWTP starting on April 25, 2014 and continuing to date who has suffered injuries to person and property as a result of said exposure.

75. Plaintiff Marva J. Stephens is an adult resident of Flint who was exposed to toxic and contaminated water from the FWTP starting on April 25, 2014 and continuing to date who has suffered injuries to person and property as a result of said exposure.

76. Plaintiff Faith Timmons is an adult resident of Flint who was exposed to toxic and contaminated water from the FWTP starting on April 25, 2014 and continuing to date who has suffered injuries to person and property as a result of said exposure.

77. Plaintiff Faith Timmons, as next friend of Olivia Timmons, is an adult resident of Flint who brings this action on behalf of her minor child, Olivia Timmons, who was exposed to toxic and contaminated water from the FWTP starting on April 25, 2014 and continuing to date who has suffered injuries to her person as a result of said exposure.

78. Plaintiff Gregory Timmons is an adult resident of Flint who was exposed to toxic and contaminated water from the FWTP starting on April 25, 2014 and continuing to date who has suffered injuries to person and property as a result of said exposure.

79. Plaintiff Gregory Timmons, as next friend of Gregory Timmons II, is an adult resident of Flint who brings this action on behalf of his minor child, Gregory Timmons II, who was exposed to toxic and contaminated water from the FWTP starting on April 25, 2014 and continuing to date who has suffered injuries to his person as a result of said exposure.

80.     Plaintiff Sandra Walker-Pope is an adult, married resident of Flint who was exposed to toxic and contaminated water from the FWTP starting on April 25, 2014 and continuing to date who has suffered injuries to person and property as a result of said exposure.

81.     Plaintiff Lamar Washington is an adult resident of Flint who was exposed to toxic and contaminated water from the FWTP starting on April 25, 2014 and continuing to date who has suffered injuries to person and property as a result of said exposure.

82.     Plaintiff Fredie Williams is an adult, married resident of Flint who was exposed to toxic and contaminated water from the FWTP starting on April 25, 2014 and continuing to date who has suffered injuries to person and property as a result of said exposure.

83.     Plaintiff Shirley Williams is an adult, married resident of Flint who was exposed to toxic and contaminated water from the FWTP starting on April 25, 2014 and continuing to date who has suffered injuries to person and property as a result of said exposure.

84.     Plaintiff Lillie Wilson is an adult resident of Flint who was exposed to toxic and contaminated water from the FWTP starting on April 25, 2014 and continuing to date who has suffered injuries to person and property as a result of said exposure.

85.     Plaintiff Harold Woodson is an adult, married resident of Flint who was exposed to toxic and contaminated water from the FWTP starting on April 25, 2014 and continuing to date who has suffered injuries to person and property as a result of said exposure.

86.     Plaintiff Deidre Woodson is an adult, married resident of Flint who was exposed to toxic and contaminated water from the FWTP starting on April 25, 2014 and continuing to date who has suffered injuries to person and property as a result of said exposure.

87.     Plaintiff Maya Woodson, is now an adult, unmarried resident of Flint who was exposed to toxic and contaminated water from the FWTP starting on April 25, 2014 and

continuing to date who has suffered injuries to her person as a result of said exposure. At the time of filing her initial administrative complaint, Ms. Woodson was a minor child.  Thus, Harold Woodson, Maya's father, signed and filed it on her behalf.

88.     Each Plaintiff listed above, in either their individual capacity or in their representative capacity filed a timely Notice of Claim (Form 95) setting forth the suffered personal and property damages they sustained, with the United States Environmental Protection Agency.  *See* Exhibit 1, copies of all Plaintiffs' Form 95.

89.     Plaintiffs' Notice of Claim was sent on September 12, 2017, delivered and signed for by a US EPA staff member at their Washington, D. C. office on September 13, 2017. *See* Exhibit 2, copies of the letter submitting list of plaintiffs and their Form 95 and certified mail green card, acknowledging receipt by the US EPA.

90.     More than six months has passed since the time the Notice of Claim for each of the Plaintiffs was received by the US Environmental Protection Agency.  Plaintiffs have yet to receive any response.  *See* 28 USC § 2401(b).

**B.      Defendant**

91.     Plaintiffs incorporate by reference and make a part hereof all previous paragraphs as though they were fully set forth herein.

92.     Defendant U.S. Environmental Protection Agency, ("EPA"), is a federal executive agency that was created under presidential direction and congressional approval under Reorganization Act #3, effective December 2, 1970. US Congress approved the agency, under Reorganization Acts Amendment in Public Law 98-614, on November 8, 1984.

93.     The EPA is empowered, in concert with the states, to set and enforce standards for air and water quality and for individual pollutants.

94.     Included in the duties and responsibilities of the EPA is enforcing the laws, rules, and regulations regarding safe community drinking water under the Safe Drinking Water Act, 42 USC § 300f, et. seq. (1974 and as amended) and the Lead and Copper Rule ("LCR", circa 1991).

95.     In the State of Michigan, the Department of Natural Resources and Environmental Quality ("MDEQ"), is responsible for establishing, monitoring and regulating all public and water systems within the state.

96.     Region 5 of the Federal EPA oversees MDEQ.  The Region 5 office is located in Chicago, Illinois.

### Statement of Factual Allegations

97.     Plaintiffs incorporate by reference and make a part hereof all previous paragraphs as though they were fully set forth herein.

98.     In 1974, US Congress enacted the Safe Drinking Water Act, (SDWA), 42 USC § 300f et. seq.  At various later times the act has been amended.  It provides definitions relevant to this case as follows:

For purposes of this subchapter:

(1) The term "primary drinking water regulation" means a regulation which—

(A) applies to public water systems;

(B) specifies contaminants which, in the judgment of the Administrator, may have any adverse effect on the health of persons;

(C) specifies for each such contaminant either—

(i) a maximum contaminant level, if, in the judgment of the Administrator, it is economically and technologically feasible to ascertain the level of such contaminant in water in public water systems, . . .

(D) contains criteria and procedures to assure a supply of drinking water which dependably complies with such maximum contaminant levels; including accepted methods for quality control and testing procedures to insure compliance with such levels and to insure proper operation and maintenance of the system, and requirements as to (i) the minimum quality of water which may be taken into the system and (ii) siting for new facilities for public water systems.

(3) The term "maximum contaminant level" means the maximum permissible level of a contaminant in water which is delivered to any user of a public water system.

(4) Public water system - (A) In general —The term "public water system" means a system for the provision to the public of water for human consumption through pipes or other constructed conveyances, if such system has at least fifteen service connections or regularly serves at least twenty-five individuals. Such term includes (i) any collection, treatment, storage, and distribution facilities under control of the operator of such system and used primarily in connection with such system, and (ii) any collection or pretreatment storage facilities not under such control which are used primarily in connection with such system. . . .

(5) The term "supplier of water" means any person who owns or operates a public water system.

(6) The term "contaminant" means any physical, chemical, biological, or radiological substance or matter in water.

(7) The term "Administrator" means the Administrator of the Environmental Protection Agency.

(8) The term "Agency" means the Environmental Protection Agency.

(9) The term "Council" means the National Drinking Water Advisory Council established under section 300j–5 of this title.

(10) The term "municipality" means a city, town, or other public body created by or pursuant to State law . . ..

(11) The term "Federal agency" means any department, agency, or instrumentality of the United States.

(12) The term "person" means an individual, corporation, company, association, partnership, State, municipality, or Federal agency (and includes officers, employees, and agents of any corporation, company, association, State, municipality, or Federal agency).

(13)(A) Except as provided in subparagraph (B), the term "State" includes, in addition to the several States….

(B) For purposes of section 300j–12 of this title, the term "State" means each of the 50 States …

(13)(A) Except as provided in subparagraph (B), the term "State" includes, in addition to the several States…

(B) For purposes of section 300j–12 of this title, the term "State" means each of the 50 States

99.    Thus, the overall purpose of the SDWA is to ensure that the general public is adequately protected and are provided with a source of safe drinking water.

100.   Plaintiffs, in their individual and/or representative capacity, are each a "person" as defined in 42 USC § 300f (12).  As such, the Plaintiffs, in their individual and/or representative capacity, are each members of the general public.

101.   Plaintiffs, in their individual and/or representative capacity, are each users of the "pubic water system" water delivered by the City of Flint.

102.   Defendant EPA is the "Agency," as defined in 42 USC § 300f (8).

103.    The State of Michigan is a "state" as defined in 42 USC § 300f (12)(A) and (B), (13)(A) and (B).

104.   The City of Flint is a "municipality" as defined in 42 USC § 300f (10).

105.   The City of Flint operates a "Public Water System" as defined in 42 USC § 300f (4)(A).

106.   The City of Flint is a "supplier of water" as defined in 42 USC § 300f (5).

107.   Lead is a "contaminant," a chemical substance or matter in water as defined in 42 USC § 300f (6).

108.   In 1991, EPA established/published the LCR, 40 CFR § 141.80, to minimize lead and copper in drinking water. The rule established a maximum contaminant level goal

(MCLG) of zero for lead in drinking water and a treatment technique to reduce corrosion of lead and copper within the distribution system.

109.　The LCR is a ''primary drinking water regulation'' as defined in 42 USC § 300f(1)(A), that applies to the water supplied to Plaintiffs by the City of Flint.

110.　The SDWA states, "Subject to sections 300g–4 and 300g–5 of this title, national primary drinking water regulations under this part shall apply to each public water system in each State."

111.　The State of Michigan was granted "primacy" for creation and enforcement of SDWA standards by the EPA/Agency.

112.　Primacy is defined as the authority to implement the SDWA within their jurisdiction, after showing they will adopt standards at least as stringent as the US EPA's standards and make sure water systems meet those standards.

113.　Granting primacy does not entail abdicating the EPA's responsibility to ensure that there is complete compliance with the SDWA and LCR, to ensure that a community and as such, the general public has a safe water source.

114.　Thus, while the first line of supervision fell to the MDEQ, to ensure that the City of Flint public water system complied with the SDWA, the EPA retained statutory responsibility of overseeing whether or not a state, including Michigan, is in compliance with the SDWA, under 42 USC § 300g–3.

115.　This statutory responsibility includes but is not limited to:

    a.　Setting national, enforceable maximum contaminant levels for particular contaminants;
    b.　Setting required ways to treat water to remove contaminants;
    c.　Certify water system operators;
    d.　Setting requirements for water systems to test for contaminants in the water to ensure standards are achieved;

  e. Provide guidance, assistance, and public information about drinking water, collect drinking water data and oversee state drinking water programs.

  f. Quickly notify water users when there is a serious problem with water quality.

  g. Prepare or ensure preparation of publicly available consumer confidence reports on the source and quality of publicly provided tap water and summary reports of the water system compliance with drinking water safety standards.

  h. Ensuring that states comply with the Lead and Copper Rule (LCR) requirements including ensuring that a water system develop and maintain an inventory of lead service lines needed for sampling and maintaining corrosion control treatment.

116. Primacy agencies are mandated to collect detailed system and monitoring data from systems within their jurisdictions, and submit a portion of that data quarterly to EPA. The data required to be reported to EPA include information about each system, such as its name, type, population served, and source water type; violations of SDWA regulations; and enforcement actions taken to return the system to compliance.

117. EPA uses this information to track non-compliant systems, oversee state drinking water programs, track contaminant levels, respond to public inquiries, and prepare national reports for the public and Congress.

118. EPA also uses this information to evaluate the effectiveness of its programs and regulations and to determine whether new regulations are needed to further protect public health.

119. According to the US EPA Strategic Plan 2014-2018, the purpose of the EPA is to protect Human Health, achieve and maintain standards and guidelines protective of human health on drinking water systems. The plan states "Drinking water was often the cause of illnesses linked to microbiological and other contaminants."

120. The EPA Director's message begins:

> *I am pleased to present the U.S. Environmental Protection Agency's* FY
> 2014–2018 Strategic Plan*, which charts our course for protecting public
> health and the environment in every community in America during the
> next four years.*

121.    The Plan continues stating: "Over the next 4 years, EPA will reinvigorate efforts to improve water quality, working with states, territories, and tribes to better safeguard human health and make America's water systems sustainable and secure.  We will:

> Foster increased protection of drinking water sources through improved
> coordination between CWA and SDWA programs at the national,
> regional, state, and watershed scales . . .

122.    Continuing further, the Plan states: "Over the next 4 years, EPA will help protect human health and make America's water systems sustainable and secure by:

- Strengthening compliance with drinking water standards
- Developing new and revising existing drinking water standards to address known and emerging contaminants that endanger human health;
- Supporting states, tribes, and territories in their oversight of public water systems in implementing these standards, and supporting water systems directly through provision of guidance, training, and information.
- While promoting sustainable management of drinking water infrastructure, we will provide needed oversight and technical assistance to states, tribes, and territories, so that their water systems comply with or exceed existing standards and are able to comply with new standards.
- We will also promote the construction of infrastructure that brings safe drinking water into the homes of small, rural, and disadvantaged communities and increase efforts to guard the nation's critical drinking water infrastructure.
- In addition, EPA is actively working Agency-wide and with external partners and stakeholders to implement a multi-faceted drinking water strategy.
- With this approach, EPA seeks to: address chemicals and contaminants by group, as opposed to working on a chemical-by-chemical basis; foster the development of new drinking water treatment technologies; use the authority of multiple statutes in addressing drinking water contamination; and encourage collaboration with states and tribes to share more complete data from monitoring at public water systems.

- To this end, the Agency is replacing the federal and state components of EPA's Safe Drinking Water Information System (SDWIS) with a new system. SDWIS Prime is designed to assist regulatory agencies with their implementation of the public water system supervision (PWSS) program, as well as improve the efficiency of sharing drinking water data among states, tribes, and the Agency. "

123.  A review of Michigan's compliance with the SDWA was completed in 2010 (for the period of 2008-2009). The compliance review team included personnel from MDEQ and EPA Region 5. The report concluded that Michigan had disinvested from ten (10) SDWA mandatory requirements.

124.  "Disinvestment" means to temporarily forfeit oversight functions required to implement the SDWA. EPA Region 5 was aware of and approved of the disinvestments.

125.  These disinvestments allowed Michigan to act below the federally mandated rules and policies, which they knew could have an impact on public health.

126.  Michigan and EPA Region 5 were advised to review the disinvestments because these could impact public health.

127.  EPA Region 5 staff and managers breached their statutory duty to ensure that MDEQ was in compliance with the rules and policies of the SDWA, because they failed to review the disinvestments as required by the compliance review team in 2010.

128.  No action was taken by EPA to ensure that MDEQ was properly exercising primacy. Thus, EPA Region 5 allowed the MDEQ to continue these disinvestments, which caused Plaintiffs to suffer personal injury and personal and real property damages.

129.  A review of MDEQ's compliance rates was also completed in 2015. This review determined that the disinvestment level had increased from 2010.

130.  EPA Region 5 officials stated that disinvestments were "more administrative and generally did not have a direct public health impact." Thus, EPA Region 5 allowed

MDEQ to continue these disinvestments, which caused Plaintiffs to suffer personal injury and personal and real property damages.

131.    Again, no action was undertaken by EPA Region 5 to ensure that MDEQ was properly exercising primacy, or that they were actually capable of exercising primacy.

132.    Between 2010 and 2015, EPA Region 5 management and staff were under a statutory mandate to intervene to ensure that the MDEQ was in compliance with federal standards to ensure that Michigan had safe drinking water.  They failed to do so in those years and following years.  Thus, EPA Region 5 allowed the MDEQ to continue these disinvestments, which caused Plaintiffs to suffer personal injury and personal and real property damages.

133.    Multiple businesses were hired by the City of Flint between 2011 and 2016, to ensure that the general public, who were users of the water system that delivered water to the community, were in fact being provided and using safe drinking water.

134.    Those businesses, known to MDEQ and EPA Region 5, failed to properly perform their jobs.

135.    MDEQ and EPA Region 5 failed to oversee the work these companies performed, failed to intervene when it was obvious their work was deficient, and otherwise failed to protect the public water supply delivered to the City of Flint.

136.    On June 26, 2013, the City of Flint entered into a resolution to switch over to the use of the Flint River as a primary water source in April, 2014.  This also authorized action to prepare the FWTP in anticipation of using the Flint water as the primary water source.

137.    On April 25, 2014, under the direction of Emergency Manager Darnell Earley and the MDEQ, Flint water users, including Plaintiffs, began receiving Flint River water from

their taps even though on-site Flint DPW Employee, Michael Glasgow, warned that the FWTP was not ready.

138.   No corrosion control was put in place prior to, or after April 25, 2014.

139.   Within days after the switch, state actors in the MDEQ began receiving complaints from water users, including some or all of the Plaintiffs, that the water was cloudy and discolored in appearance and foul in taste and odor.

140.   In the weeks after the switch, water users, including some or all of the Plaintiffs, were reporting to the state actors in the MDEQ that they were experiencing hair loss, rashes, vomiting and other physical maladies.

141.   Over the course of the next eight (8) months, Flint water users continued to express their concerns about water quality in multiple ways including letters, e-mails and telephone calls to Flint officials, the media and through well publicized demonstrations on the streets of Flint.

142.   Throughout the spring and summer of 2014, the water supplied to Flint water users was malodorous, tasted bad, and appeared to be cloudy with floating dirt or metallic particles.

143.   In June 2014, citizen complaints about contaminated water continued and the State failed to do anything to address these complaints.  The MDEQ failed and/or refused to notify Flint water customers, including Plaintiffs, of the likely source of their complaint.

144.   Most of Flint's 550 miles of water mains are over seventy-five years old and constructed of cast iron piping.  Cast iron pipe is subject to internal corrosion, which causes buildup on the pipe interior, leading to water quality issues, reduced flow and

pressures, and leakage.  This corrosion also encourages layers of bacteria to attach to the inner pipe wall.

145.    Defendant EPA knew that as a consequence of the failure to use the required and necessary anti-corrosive agent in the Flint River water, Plaintiffs were being exposed to toxic levels of lead and other metals, chemicals and bacteria.

146.    In accordance with the LCR, all large public water systems, including Flint's, are required to install and maintain corrosion control treatment for lead and copper water service systems.

147.    In August 2014, Flint's water tested above legal limits set forth in National Primary Drinking Water Regulations Maximum Contaminate Level ("MCL") for total coliform and E. Coli bacteria.  Flint water users received a notice in August 2014 of an acute coliform MCL violation in August 2014, and monthly coliform MCL violations in August and September 2014.

148.    In response, Flint issued boil water advisories on August 16, 2014 and September 5, 2014 and treated the bacterial contamination with additional chlorine.  EPA officials failed to act at this time.

149.    Additionally, there were Average MCL and total Trihalomethane ("TTHM")violations in December 2014 and June 2016.

150.    MDEQ, EPA and City of Flint officials, as well as the companies they hired, had knowledge that adding chlorine to water in corroded pipes was an ineffective treatment for bacteria because it preferentially reacts with the bare metal, stripping away the pipes' protective coating.  Notwithstanding this knowledge, and that the initial chlorine

treatments were ineffective at treating bacteria, more chlorine was added causing additional damage by creating high levels of TTHM.

151.    It is well known in the scientific community that high levels of TTHM are an indication that pipes are unprotected and corroding.

152.    On October 13, 2014, the General Motors Corporation announced that it would no longer use Flint River water in its Flint plant because of, among other things, its corrosive qualities.  Despite this clear evidence of serious and significant danger, no one took any action to alter the course of the health crisis, or to inform/warn Flint water users/customers of the likely source of the complaints, and how to protect themselves from further exposure to the water that was unfit for human consumption.

153.    Jan Burgess, as a Flint home owner and public water user, made numerous complaints to state and city officials about the poor water quality she was experiencing.  Neither the state nor the city gave her satisfactory information about how and when the water quality would be improved.

154.    Burgess determined she was living in an environmental crisis and turned to the EPA for assistance.

155.    Burgess discovered on the EPA's website a section entitled "Enforcement."  The web page gave her instructions on how to report violations of environmental laws and regulations.  The Enforcement page stated that if she elected to provide contact information with her report, that information may be "shared by EPA with appropriate administrative, law enforcement, and judicial entities engaged in investigating or adjudicating the tip or complaint."

156.   On October 14, 2014, Burgess presented to her complaint to the EPA and requested an

investigation.  She wrote:

> Tip or Complaint: Earlier this year, the City of Flint, changed its water
> supply from the City of Detroit (Lake Huron) to the Flint River. This river
> has a very long history of pollution. Since this change, our drinking water
> has tripled in cost and the quality varies daily. Some days it smells like an
> over-chlorinated swimming pool; other days, like pond scum. It is often
> brown in color and frequently has visible particles floating in it. We've
> been under several boil water advisories due to e-coli contamination. Just
> this morning our local paper reports that General Motors Engine plant has
> shut off Flint River water to the plant due to the over-chlorination and the
> fears that the water will cause corrosion.
>
> http://www.mlive.com/news/flint/index.ssf/2014/10/general_motors
>
> _wont_use_flint.html#cmpid=nsltr_stryheadline.
> People in Flint have had to resort to buying bottled water or having
> purification systems installed in their homes. Some residents have even
> had private wells dug. The water is not safe to drink, cook or wash dishes
> with, or even give to pets. We worry every time we shower. The City of
> Flint is still very economically depressed and most citizens cannot afford
> to do anything other than use the river water. Many of them have NO
> water at all due to the extremely high water bills. There is reasonable
> suspicion that reports have been falsified. Some residents have had water
> tested privately and the results are not even close to those reported by the
> City. Calls to the City and State have resulted in no action whatsoever.
>
> Violation Still Occurring? Yes
>
> State DEP/DEQ/DEM Notified? No

157.   On October 23, 2014, EPA employee, Michigan Program Manager Jennifer Crooks

("Crooks"), responded to Burgess' email stating in part that "the Flint River water is a

different quality than the Lake Huron raw water; and requires additional treatment to

ensure an acceptable quality drinking water."  She emphasized that the poor quality

water was only a temporary problem because Flint planned to join the Karegnondi

Water Authority (KWA) in 2016.  She stated the "MDEQ is aware of the multiple

complaints from citizens and is working closely with the Flint Water Department to

ensure the distribution system and the water treatment processes work more efficiently and more effectively."

158. The statement demonstrates employee Crooks specifically and the EPA, as her employer, were deliberately indifferent to the plight of Flint water users, and they could suffer because it would only last for two more years.

159. Additionally, Crooks statement is an acknowledgment that EPA knew Flint River water was being used and that it "required additional treatment to ensure an acceptable quality drinking water."

160. This response put the EPA on actual notice that they needed to investigate whether or not adequate treatment was being done to ensure that Flint was in compliance with the SDWA.

161. There is no reference to EPA working with state and local officials to determine if in fact the "required additional treatment" was being done then, or of it had been mandated in the near future.

162. Burgess did not state that just her house or water was affected.  She stated the public water source of the City of Flint was the problem.  She issued a cry for the general public to be helped by the EPA in response to the emerging crisis.

163. Burgess heard nothing more from the EPA until April 8, 2016, when investigators of the EPA's Office of Inspector General contacted her for an interview regarding her report. Ms. Burgess met with the EPA investigators on April 9, 2016, for about 1.5 hours.

164.   At the time of interview, the EPA investigator advised Burgess and her counsel that the EPA had received 120 complaints or notices of environmental violations and most, if not all, had not been investigated.

165.   The duration of time between Burgess' report of an environmental violation and the opening of an investigation was 543 days or 1 year, 5 months and 26 days.

166.   In November 2014, MDEQ, EPA, and City of Flint officials recognized and were on actual notice of the need to assess the factors contributing to high levels of TTHM following the water source change based on a report prepared by LAN entitled "Operational Evaluation Report" to assess the factors contributing to high TTHM levels in Flint following the source change.   The report was mandated or required by the National Primary Drinking Water Regulations when water tests show TTHM or HAA5 levels in excess of 80 percent of the MCL.   The focus of this report was to identify potential causes and remedial actions for lowering TTHM levels.

167.   After seven months of exposure to elevated TTHM levels, in January 2015, Flint water users belatedly received a notice stating that the water was not in compliance with the Federal Safe Drinking Water Act due to unlawful levels of TTHMs.

168.   Despite the actual knowledge of its employees and a duty to act, EPA did nothing to correct the foregoing problems and failed to timely advise/warn Plaintiffs of the dangers presented by the high TTHM levels.

169.   The discoloration of Flint's water should have alerted EPA's employees, that the city's pipes were dangerously corroded, as discoloration and rust are products of corrosion.

170.   The EPA required a city such as Flint with lead pipes to maintain corrosion control protocols to protect the public from lead entering drinking water.   The LCR requires

corrosion controls for lead if the 90th percentile of samples exceed levels of 0.015mg/L of lead.

171.   During the relevant time period, Plaintiffs were unaware of the toxicity and contamination of the water supply they regularly used for drinking, cooking, washing, bathing, showering, dish and clothes washing, which contamination resulted from Defendant's employees' conduct and failure to act to protect the community.

172.   In January 2015, Flint homeowner LeeAnn Walters called the EPA regarding water issues she was experiencing at her Flint home.  She informed the EPA that she and her family members were becoming physically ill from exposure to the water coming from her tap.

173.   On February 26, 2015, Crooks, sent an email to Stephen Busch ("Busch") and Mike Prysby ("Prysby") with copies to Thomas Poy and Miguel Del Toral ("Del Toral") of the EPA, stating her concerns about the lead levels in Flint:

> … (T)he main purpose of my emails is to alert you to the high lead levels reported to a citizen yesterday by Flint Water Dept. I have been discussing the water situation with LeeAnn Walters since January, and she has been talking to Mike Glasgow at the plant about the black setiment (sic) in her water… (Glasgow did test it to find that the iron levels were greater than his test would go…. But, because the iron levels were so high, he suggested testing for lead and copper. WOW!!! Did he find LEAD! **104 parts per billion**. She has two children under the age of three… Big worries here.
>
> We also talked about Dr. Joan Rose from Michigan State being on the Flint Tech Advisory committee…would want to dive further into this…she and her family are also exhibiting the rashes when exposed to the water, and her daughter's hair is falling out in clumps.
>
> So, Steve, this goes back to what you and I were talking about yesterday. That the different chemistry water is leaching out contaminants from the insides of the biofilms inside the pipes. I think Lead is a good indication that other contaminants are also present in the tap water, that obviously were not present in the compliance samples taken at the plant… And since

Ms. Walters' drinking water is showing the high lead levels, her tap water would be a good place to start, I think.

174. In a second email on February 26, 2015, Crooks stated that Miguel Del Toral, EPA Region 5 Ground Water and Drinking Water Regulations Manager, ("Del Toral") is of the opinion that the "black sediment" in Walters water was actually lead. She stated that "Miguel is wondering if Flint is feeding phosphates. Flint must have Optimal Corrosion Control Treatment-is it phosphates?"

175. Crooks continued: "From a public health perspective, can we assume that the high lead levels in Mrs. Walters' neighborhood are isolated to just her area? Or are they more widespread?"

176. On February 27, 2015, Crooks emailed MDEQ representative Stephen Busch and offered to provide their expert, Mike Schrock.

177. In response to that email, Busch advised Del Toral and Crooks that "[MDEQ] will take the [offer of expert assistance] under consideration." He further stated that Flint has an "Optimized Corrosion Control Program."

178. EPA did not express any sense of urgency in response to this comment.

179. Del Toral, on February 27, 2015, advised Crooks that this is a very dangerous situation. He stated that "the particulate can contain very high concentrations of lead (hundreds of thousands of ppb Pb) which is much higher concentration than lead paint, so even small particles can result in high lead values."

180. Del Toral, emailed Prysby, an engineer in the MDEQ Community Water Supply Program, and Crooks, regarding his concerns of the high lead levels detected in the water:

What I was saying is that where you find lead values that high, it is usually due to particulate lead.

Particulate lead is released sporadically from lead service lines, leaded solder and leaded brass… If systems are pre-flushing the tap the night before collection (of Lead and Copper Rule) compliance samples (MDEQ still provides these instructions to public water systems) this clears particulate lead out of the plumbing and biases the results low by eliminating the highest lead values. If systems are pre-flushing and still finding particulate lead, the amount of particulate lead in the system can be higher than what is being detected using these 'pre-flushed' first-draw samples. My point on that was that people are exposed to the particulate lead on a daily basis, but the particulate lead is being flushed away before collecting compliance samples, which provides false assurance to residents about the true lead levels in water.

181. Throughout this time frame, Flint residents began flooding Crooks' inbox about their concerns of the water quality.

182. In March 2015, the City of Flint increased the ferric chloride dosage used in the filtration process to decrease the TTHM levels.

183. On March 3, 2015, Flint collected a follow-up sample at the Walters home.  This time the reading was 397 ppb (more than 20 times the EPA "Action Level" of 15 ppb).

184. On March 18, 2015, Walters informed Crooks of the results from the March 3rd sample. Crooks asked Walters to fax her the report.  Following her receipt of the report, Crooks stated "any thoughts on how to respond to her?  I'm running out of ideas."

185. According to the OIG Report, in February, 2015, the "EPA Region 5 received the first Flint drinking water distribution system lead sampling test result, indicating a requirement of corrosion control."

186. By March 2015, Del Toral was communicating with Region 5 EPA personnel, stating there was a serious public health crisis developing in Flint caused by contaminated water.

187.    Walters also provided the EPA with reports of elevated blood lead levels for her children proving that consuming lead-laced water had poisoned her children.

188.    In early April 2015, Walters called Dr. Marc Edwards ("Dr. Edwards"), an environmental engineering professor from Virginia Tech University.  In April 2015, Dr. Edwards took water samples and shared his test results with the EPA.

189.    On April 23, 2015, Del Toral wrote an email to the MDEQ and asked one question: "What's Flint doing now (post Detroit) for corrosion control treatment?"

190.    On April 24, 2015, the MDEQ wrote back that "Flint is not practicing corrosion control treatment at the Water Treatment Plant (WTP)."

191.    On April 25, 2015, Del Toral sent an email to the MDEQ and his EPA colleagues stating "given the very high lead levels found at one home and the pre-flushing happening at Flint, I'm worried that the *whole town* may have much higher lead levels than the compliance indicated, since they are using pre-flushing ahead of their compliance sampling." (Emphasis added).

192.    On April 27, 2015, Del Toral went to the Walters home to investigate the circumstances causing the elevated lead readings.  The EPA also tested neighboring homes.

193.    Ultimately, testing and investigation determined that the city-owned service line of about 25 feet running from the water main to the external shut off valve was made of lead and a source of the lead contamination.  In addition, the Walters home had galvanized pipe which became "seeded" with lead due to corrosive water.

194.    According to Del Toral, the lack of corrosion control treatment was a major contributing cause for the release of lead into the Walter's water system.

195.   On May 6, 2015, the EPA returned to the Walters home to supervise the service line replacement activities.

196.   By June 2015, "EPA Region 5 had information that the city of Flint exceeded the lead level at which corrosion control was required, and that Flint was not using a corrosion inhibitor.   EPA Region 5 also had information that at least four homes had concentrations of lead in household drinking water above the action level of 15 parts per billion."

197.   On June 10, 2015, the EPA told MDEQ to offer additional technical assistance on response managing the different water quality issues in Flint, including the presence of lead in the drinking water.

198.   On June 24, 2015, Del Toral prepared a memorandum entitled "High Lead Levels in Flint Michigan-Interim Report.  His report stated that "A major concern from a public health standpoint is the absence of corrosion control treatment in the City of Flint for mitigating lead and copper levels in the drinking water."  Additionally, "the lack of mitigating treatment is especially concerning as the high lead levels will likely not be reflected in the City of Flint's compliance samples due to the sampling procedures used by the City of Flint for collecting compliance samples."

199.   Rita Bair, ("Bair") the EPA Branch Chief Region 5, emailed Del Toral asking why he labeled the problem as widespread.

200.   Del Toral responded on June 25, 2015, with the following:

> "The widespread high lead is my judgment based on a couple of decades of working with lead issues and I stand by it despite the limited data set from Flint. A simple application of scientific principles to the circumstances in Flint along with the limited data are enough to know that there is a problem there. They have had no corrosion control treatment in place for over a year now and they have lead service lines.

It's just basic chemistry on lead solubility. You will have high lead leaching into the water where you are doing nothing to mitigate that. We don't need to drop a bowling ball off every building in every town to know that it will fall to the ground in all of these places….The only reason we don't have more data is because the City of Flint is flushing away the evidence before measuring for it…there is zero chance or close to zero chance that you will ever capture any of the high lead…. the high lead levels we are seeing in Flint are mainly particulate lead, which is released sporadically in most cases, so unfortunately for Flint in their attempts to avoid capturing lead, these particles are being captured despite their attempts not to capture lead. **I understand that this is not a comfortable situation, but the State is complicit in this and the public has a right to know what they are doing because it is their children that are being harmed. At a minimum, the City should be warning residents about the high lead, not hiding it telling them that there is no lead in the water. To me that borders on criminal neglect**. The only people that question the science are the ones that have a vested interest in not finding lead. When we look, we find it. When they look, they either don't find it or if they find it, they dismiss it as the resident's plumbing or use some other fabricated reason. (Emphasis added)

201.   EPA had been on notice for several years that the reporting capabilities of MDEQ were inadequate and it was their duty to see that proper reporting occurred.

202.   The day following the Del Toral report's release, he shared it with Walters, who circulated it to Curt Guyette ("Guyette"), an investigative reporter to with the American Civil Liberties Union ("ACLU").

203.   Guyette confirmed the accuracy of the Del Toral Report by interviewing Del Toral who confirmed that the assertions contained in the Report were accurate.

204.   After Guyette contacted the City of Flint for comment, Mayor Dayne Walling ("Walling") informed Dr. Susan Hedman ("Hedman"), EPA Region 5 Director, on June 30, 2015, that Del Toral's Report was released and shared publicly.

205.   On July 1, 2015, Hedman informed Walling that the Del Toral Report "should not have been released outside the agency," and recommended that Flint retain two EPA experts on lead and drinking water.  Walling asked Hedman to advise the ACLU that Flint

should follow the advice of the MDEQ.  The next day, Hedman responded saying, "I am not inclined to have any further communication with the ACLU representative."

206.  After various news reports swirled regarding the gravity of Flint's water quality, Hedman released a statement on July 10, 2015 stating, "EPA will work with the Michigan DEQ and the City of Flint to verify and assess the extent of lead contamination issues and to ensure that Flint's drinking water meets federal standards."

207.  When Guyette asked the EPA if phosphate should be used as corrosion control as well as whether sampling methods affected lead readings on July 14, 2015, the EPA attempted to give an ambiguous response in order to protect the MDEQ and its employees.  Their answer should have been an unequivocal "YES."

208.  On July 21, 2015, EPA representatives had a conference call with MDEQ representatives. The MDEQ argued with the EPA about the necessity of immediate corrosion control treatment in light of what it alleged was "compliant sampling."  The EPA was concerned about the validity of the MDEQ position, because the EPA had doubts as to whether the sampling was done properly.

209.  On August 10, 2015, EPA representatives asked the MDEQ for an update on the status of the corrosion control treatment; however, no information was forthcoming.

210.  On August 17, 2015, MDEQ sent a letter to Flint recommending that Flint implement corrosion control treatment as soon as possible, but no later than January 1, 2016, and to fully optimize its treatment within six months.

211.  On August 28, 2015, the EPA asked the MDEQ to provide Flint's corrosion control compliance plan.

212.   On August 31, 2015, the MDEQ continued to argue with the EPA about whether corrosion control is necessary because the sampling establishes compliance.

213.   On August 31, 2015, Dr. Edwards published the results of his water testing and reported that 20 % of the samples were over the 15 ppb EPA Action Level.  Dr. Edwards' report revealed that 42 % of the homes tested in Flint had levels of 5 ppb or higher.

214.   On August 31, 2015, the EPA and MDEQ engaged in a conference call to respond to Dr. Edwards' report of an emerging major public health crisis.  The EPA suggested that the participants could discredit Dr. Edwards' findings because his labs were not "certified."  The EPA noted that Dr. Edwards' website "is putting added pressure on the MDEQ and EPA to ensure that Flint addresses their lack of optimized corrosion control treatment in an expedited manner in order to protect the residents from exposure to high lead levels."  The EPA acknowledged in this call that "to delay installation of corrosion control treatment in Flint would likely cause even higher levels of lead over time as Flint's many lead service lines are continuously in contact with corrosive water."

215.   Despite the acknowledgment that "to delay installation of corrosion control treatment in Flint would likely cause even higher levels of lead over time as Flint's many lead service lines are continuously in contact with corrosive water," EPA breached their duty and failed to step in and not only address the crisis, but they failed to take any action to alleviate the issue and warn the public of the danger they faced .

216.   On September 3, 2015, media reports indicated that Dr. Edwards' reports showed that there is an immediate public health crisis at hand.  The media reported that the highly

corrosive Flint River water was causing lead contamination in Flint homes and that the corrosion control plan would be implemented in January, 2016.

217. On September 9, 2015, Jessica Dupnack ("Dupnack") of ABC Channel 12 asked the EPA if "there is any warning to citizens about drinking the water?"  Peter Cassell ("Cassell"), Press Officer of the EPA, did not issue any warning and actually stated that the "lead monitoring shows Flint has not exceeded the lead action level …."  Cassell further adds that "Flint recently accepted EPA's offer to provide technical assistance to the City and MDEQ …."

218. When Flint area, Congressman Dan Kildee asked the EPA if the Del Toral Report findings were correct on September 9, 2015, Hedman and the EPA once again provided a vague response almost 6 days later.

219. On September 11, 2015, Crooks emailed MDEQ representatives stating: "Just to clarify; on our call, I wanted to remind you that Miguel's report had DEQ cc'd. So if the Legislature or whoever might say you all were cc'd, you can truthfully respond that it was EPA's request that the report not be sent to the ccs.  Consequently, you all never received the report from Miguel."  Crooks was fully aware that the MDEQ representatives had received the report from the public media when Guyette published his story about the Del Toral.

220. On September 14, 2015, Debbie Baltazar, Water Division Branch Chief for EPA Region 5, wrote an email which stated that "perhaps [Hedman] already knows all of this, but I am not sure Flint is the community we want to go out on limb for."

221. According to the EPA's Office of Inspector General Report dated October 20, 2016, "Region 5 did not formally brief [Office of Enforcement and Compliance Assurance]

(OECA) about Flint's water issues until September, 2015. Staff and managers in OECA viewed the Flint situation as one in which it was appropriate for the region to take Section 1431 action, and recommended that the region take such action. However, Region 5 declined to take emergency action, on the basis that the ongoing state actions constituted a jurisdictional bar."

222.    On September 18, 2015, EPA Director of Water Division, Tinka Hyde, made a formal request for EPA experts Lytle and Schock to be assigned to Flint to provide technical assistance.

223.    On September 20, 2015, Dr. Edwards sent an email to Lytle and Schock and other EPA officials. In this email, Dr. Edwards made a strong case that the Flint/MDEQ prior sampling should be rejected as non-compliant with basic testing protocol and that "someone at HQ or in R5 should immediately take decisive action on this issue to protect the public." He stated:

> 1) FLINT HAS LOTS OF LEAD PIPE, NO CORROSION CONTROL TREATMENT, AND HAS NO LEGITIMATE LCR TESTING FOR AT LEAST A YEAR.
>
> 2) AMONGST LOW INCOME INFANTS, BREAST FEEDING RATES ARE LOWER, AND FORMULA USE IS HIGHER. MANY FLINT RESIDENTS CANNOT AFFORD TO FLUSH DUE TO HIGH WATER RATES, THEY CANNOT AFFORD BOTTLED WATER. THIS IS AN UNPRECEDENTED SITUATION AND EPA NEEDS TO TAKE THIS SERIOUSLY. NOW
>
> 3) WE HAVE ONE CHILD WITH ELEVATED BLOOD LEAD ALREADY….IN FACT, THAT IS THE ONLY REASON WE KNOW ABOUT ANY OF THE ABOVE.
>
> 4) MDEQ IS STILL PUBLICLY INSISTING FLINT WATER HAS TESTED SAFE, IS SAFE, AND THAT FLINT HAS **NO VIOLATIONS** OF ANY SORT. (Emphasis in text)

224.     On September 21, 2015, Dr. Edwards published on his website his advice to Flint water users: "Drink or cook with the water only if a proper filter is used and flushing for 5 minutes before the water is used for drinking or cooking." Dr. Edwards provided this information to the EPA. The EPA responded by stating that the agency is "looking into the information you have provided." Elected Officials met with EPA and MDEQ representatives to review the situation and options.

225.     On September 21, 2015, Dr. Mona Hanna-Attisha presented her study of elevated blood lead levels for children in Flint to Walling, Natasha Henderson, City Administrator and Howard Croft, Director of Flint Public Works. Dr. Hanna-Attisha documented that increases coincided with the timeline switching to the Flint River water. Dr. Edwards provided this information to the EPA.

226.     Dr. Edwards also informed the EPA that Dr. Hanna-Attisha reported that the EPA had given the City a "blessing that they were in compliance and there was no corrosivity" issue. Dr. Hanna-Attisha pushed for a health advisory to be published to the citizens of Flint.

227.     On September 22, 2015, Dr. Edwards emailed the EPA stating:

> MDEQ will go to their graves insisting Flint has met all Federal LCR standards…higher numbers of EBL kids be damned. They are also telling people that EPA has said that there is no absolutely no corrosion problem in Flint water.

228.     On September 24, 2015, Dr. Mona Hanna-Attisha held a press conference to release her study and findings. She concluded that every child in Flint is presumed to have ingested lead and has been harmed by this toxic metal.

229.     The following day, on September 25, 2015, the City of Flint issued a lead advisory which states in part:

> The City of Flint is issuing a lead advisory for residents to be aware of lead levels in drinking water after hearing concerns from the medical community. While the City is in full compliance with the Federal Safe Drinking Water Act, this information is being shared as part of a public awareness campaign to ensure that everyone takes note that no level of lead is considered safe.

230.  On September 27, 2015, Hedman called MDEQ Director Dan Wyant and discussed the need for expedited implementation of corrosion control treatment.

231.  On October 1, 2015, the Genesee County Health Department issued a "Do Not Drink the Water" Advisory.  The Natural Resources Defense Council on behalf of Dr. Edwards, Coalition for Clean Water, and Concerned Pastors for Social Action and other interested groups and individuals filed a Notice of Intent to Bring Suit against the EPA to force the EPA to take action to abate the imminent and substantial endangerment to the health of Flint residents.

232.  On October 8, 2015, Michigan Governor Snyder announced that the City of Flint would switch back to DWSD water.

233.  On January 16, 2016, the Governor of Michigan declared a state of emergency.

234.  On January 21, 2016, the EPA issued its Emergency Administrative Order pursuant to § 1431 of the Safe Drinking Water Act, 42 U.S.C. § 300i stating in part:

> The presence of lead in the City water is principally due to lack of corrosion control treatment after the City's switch to the Flint River as a source in April 2014.  The river's water was corrosive and removed protective coating in the system.  This allowed lead to leach into the drinking water, which can continue until the system's treatment is optimized.

> The City, MDEQ and the State have failed to take adequate measures to protect public health….there continue to be delays in responding to critical EPA recommendations…the EPA remains concerned that the City lacks the professional expertise and resources needed to carry out the recommended actions and to safely manage the City's PWS.  Paragraph 34 of Complaint.

235.   On March 17, 2016, EPA Administrator Gina McCarthy testified before Congress.  She appeared before House Oversight and Government Reform Committee and admitted that the EPA tried but could not achieve corrosion control in a timely manner.  Chairman Representative Jason Chaffetz asked her: "When did you know the [MDEQ] didn't do [corrosion control]?"  McCarthy said:

> [W]e [EPA] knew on July 21st of a systemic problem.  The state [MDEQ] agreed the next day and then all they did was slow walk [corrosion control].  That's why we had to do it the way we did.  I wished we had gone further. I wish we had gone farther. I wished we had yelled from the tree tops but there is no way that my agency created this problem or there was ambiguity in the law that wouldn't have done the same that the governor said.  Don't put people at risk just because we couldn't figure out in the life of us, in our guidance, we never thought anybody goes from a treated system to an untreated system and not treat it [with corrosion control].  I didn't think we ever had to say that because I never thought anyone would.  That's where we are today.

236.   It is an undisputed fact that the MDEQ and Flint failed or refused to use corrosion control during the entire time that Flint River water was supplied to Flint water users (April 25, 2014 to October 16, 2015).  Flint water users were exposed to the toxic and highly corrosive Flint River water for 539 days or 1 year, 5 months and 21 days.

237.   Although DWSD water was restored to the Flint water system, the 539 days of exposure to highly corrosive Flint River water ruined the lead service lines, hot water tanks and other plumbing apparatus.

238.   As of April 25, 2016, the two-year anniversary of the switch to the Flint River, the water delivered to the people of Flint remained unsafe to drink, use for cooking or use for bathing.  As of the date of this filing, the water still remains unsafe.

## COUNT I: NEGLIGENCE

239. Plaintiffs incorporate by reference and make a part hereof all previous paragraphs as though they were fully set forth herein.

240. The United States shall be liable, respecting the provisions of this title relating to tort claims, *in the same manner and to the same extent as a private individual under like circumstances*. *See* 28 USCS § 2674.

241. All of the events which give rise to this cause of action occurred in the state of Michigan.

242. The EPA is liable for the knowledge of and acts and omissions of its agents and employees, including but not limited to Jennifer Crooks, Rita Bair, Debbie Baltazar and Dr. Susan Hedman.

243. This case involves a major failure of all levels of government to protect the health and safety of the public.   Local, state and federal agencies and employees, working individually and at times in concert with each other, mismanaged this environmental catastrophe.

244. The Michigan Supreme Court has recognized that a "private individual" is subject to the tort duties established by Section 324A of the Restatement of Torts, 2d.  *See Smith v. Allendale Mut. Ins. Co.*, 410 Mich. 685,705; 303 N.W.2d 702, 1981 Mich. LEXIS 251 (Mich. 1981) and more recently *Fultz v. Union-Commerce Assocs.*, 470 Mich. 460,464; 683 N.W.2d 587, 2004 Mich. LEXIS 1523 (Mich. 2004) (noting that "Michigan courts have accepted the Restatement of Torts, 2d, § 324A, as an accurate statement of Michigan law and used the principles stated above in analyzing plaintiffs' claims in the past").

245. This section of the Restatement provides:

§ 324A Liability to Third Person for Negligent Performance of Undertaking

One who undertakes, gratuitously or for consideration, to render services to another which he should recognize as necessary for the protection of a third person or his things, is subject to liability to the third person for physical harm resulting from his failure to exercise reasonable care to protect his undertaking, if

(a) his failure to exercise reasonable care increases the risk of such harm, or

(b) he has undertaken to perform a duty owed by the other to the third person, or

(c) the harm is suffered because of reliance of the other or the third person upon the undertaking.

246. The EPA, as a federal agency, retains national oversight and responsibility for state administration and enforcement of SDWA through its employees. As such, the EPA was responsible for ensuring Flint's new water system complied with SDWA.

247. The EPA Region 5 had a sufficient knowledge to issue an emergency order pursuant to SDWA § 1431 when it formally notified the Office of Enforcement and Compliance in September of 2015.

248. The EPA had statutory authority to issue SDWA § 1431 Action.

249. In response to the critical information provided to them, OECA ordered the EPA Region 5 to issue an emergency order in September 2015; yet the EPA failed to take swift action and instead deflected responsibility on other agencies and government bodies, until January 21, 2016 when it finally issued its emergency order.

250. As a result of EPA Region 5's severely delayed issuance of § 1431 Action, state and city officials were not required to "ensure that Flint's drinking water system is re-optimized for corrosion control, that the city establishes the capacity to safely and effectively

operate its drinking water system, and that there is public transparency and accountability" until January 21, 2016.

251. The EPA's failure to act swiftly and issue an emergency order pursuant to § 1431 significantly increased Plaintiffs' exposure to the bacteria and lead-filled water. Restatement of Torts, 2d § 324A (a).

252. Had swift § 1431 Action been taken corrosion control treatment would have been imposed on Flint or another remedy developed so that the harm to Plaintiffs would have been prevented.

253. The EPA undertook the task of rendering services to the MDEQ "for the protection" of the Flint water users. In February 2015, the EPA rendered service to the MDEQ and responded to LeeAnn Walters' complaints about being exposed to contaminated Flint River water. By undertaking this task, the EPA owed a duty of care to prevent or reduce the risk of harm to all the residents, property owners and other users of the water in the City of Flint, including these Plaintiffs.

254. Walters did not say that it was just her water that was a problem. She stated that the water provided by the City of Flint, in the City of Flint was at issue.

255. The Statement of Facts recited above establishes that the EPA was an active actor in the mismanagement of the unfolding environmental disaster. They failed to comply with their congressional mandate.

256. Crooks was aware that the Flint River was highly corrosive and that Flint had older corroded lead service pipes, which required corrosion control treatment. She knew in February 2015 that Del Toral observed lead based "black sediment" in the Walters' water.

257.    In February 2015, Crooks was aware that exposure to the Flint River water was causing skin rashes and falling clumps of hair from a family member of the Flint Tech Advisory Board.

258.    In February 2015, EPA agent Del Toral informed Crooks that the absence of corrosion control treatment could explain the presence of lead particles floating in the water.

259.    Based on the facts supplied by Del Toral, Lee Ann Walters and Jan Burgess, among others whose complaints were never assigned, addressed or investigated, Crooks knew or should have known that corrosion control treatment was essential for safe distribution of the Flint River water and that this treatment was likely absent from the treatment of the water.

### A. Failure to Issue § 1431 Emergency Order

260.    The EPA was required to issue a § 1431 emergency order upon learning that a contaminant which is present or likely to enter a water system may present a substantial and imminent danger to the health of persons and that the actions of state and local authorities have not been sufficient.

261.    An order issued pursuant to §1431 would require state and local officials to take actions to protect the public including providing alternative water supplies at no cost to the consumer as well as public notification of the hazard.

262.    Despite learning as early as October 2014 that Flint water users were being exposed to a substantial and imminent danger due to a contaminant in the water system, the EPA failed to fulfill its mandatory duty to issue a § 1431 emergency order. This failure persisted until January 2016.

**B. Failure to Provide Technical Assistance, Obtain Compliance and Commence Civil Action Under § 1414**

263. When the EPA learns that state or local water provider has not complied with the requirements for safe drinking water, pursuant to § 1414 of the SWDA, the EPA must provide expert advice and technical assistance. If compliance is not obtained within 30 days, the EPA must issue an order requiring the public water system to comply or commence a civil action.

264. The EPA had notice that the Flint water system was not in compliance with the requirements of the SWDA as early as October 2014.

265. Despite notice of non-compliance in October 2014, the EPA did not provide advice and technical assistance until September 2015 and never issued an order nor commenced a civil action to require the State of Michigan or the City of Flint to bring the Flint water system in compliance with the requirements of the SWDA as required by § 1414.

**C. Negligent Undertaking Regarding Corrosion Control**

266. In February 2015, the EPA rendered service to the MDEQ and responded to LeeAnn Walters' complaints about being exposed to contaminated Flint River water.

267. Upon undertaking this task, the EPA owed a duty of reasonable care to prevent or reduce the risk of harm to Walters and Plaintiffs in this case.

268. The Statement of Facts recited above establishes that the EPA was an active participant in the mismanagement of the unfolding environmental disaster.

269. Crooks knew that the Flint River was highly corrosive and that Flint had older corroded lead service pipes which required corrosion control treatment. In February 2015, she

knew that Del Toral observed lead based "black sediment" in the Walters water and that Jan Burgess reported in October 2014 floating particles in her water.

270. Furthermore, Crooks was aware that exposure to the Flint River water was causing skin rashes and falling clumps to hair from a family member of the Flint Tech Advisory Board in February 2015.

271. In February 2015, EPA agent Del Toral informed Crooks that the absence of corrosion control treatment provided a possible explanation for the presence of lead particles floating in the water.

272. Based on the facts supplied by Del Toral, Lee Ann Walters, Jan Burgess, and the many others whose complaints were unassigned and not investigated, Crooks knew or should have known that corrosion control treatment was essential for safe distribution of the Flint River water and that this treatment was probably absent from the treatment of the water.

273. By April 25, 2015, the EPA was positive that corrosion control was not being used yet failed to suggest, direct or counsel the MDEQ and Flint to implement a corrosion control program until July 2015.

274. By April 2015, this probability became a certainty and the EPA had a firm and clear knowledge that the MDEQ either refused to, or was incapable of managing the technical aspects that ensured that all environmental laws were complied with.

275. Even after the EPA directed the MDEQ and Flint to implement corrosion control in July 2015, the EPA knew that the MDEQ and Flint "slow walked" the process according to EPA Administrator McCarthy testimony on March 17, 2016.

276.   EPA Region 5 had the authority and sufficient information to require the issuance of a SDWA Section 1431 emergency order to protect Flint residents from lead contaminated water as early as October 2014.

277.   Region 5 had information that systems designed to protect Flint drinking water from lead contamination were not in place, e.g. residents had reported multiple abnormalities in the water, and test results from some homes showed lead levels above the federal action level.

278.   By the aforementioned actions, the EPA breached this duty to Plaintiffs when it unreasonably delayed in requiring Flint to promptly implement corrosion control and in failing to promptly notify Flint water users of the contamination of the water supply and the hazardous situation.  The EPA's breach of its duty caused actual injuries and harms to Plaintiffs as set forth in this lawsuit.

**COUNT II: Negligent Performance of Undertaking Regarding Timely Investigations**

279.   Plaintiffs adopt by reference and make a part hereof all previous paragraphs of this complaint as though fully set forth herein.

280.   Many Plaintiffs in this case and other City of Flint water users submitted complaints and notices of violations to the EPA in connection with their exposure and thus the general public's exposure, to poor quality water caused by the distribution of the highly corrosive Flint River water.

281.   The EPA undertook the obligation to timely investigate complaints and in so doing imposed upon itself a duty to investigate the complaints in a careful and reasonable manner so that once violations of law or regulation were detected a proper and prompt remedy could and would be pursued.

282. The reporting water users, on behalf of themselves and all other water users in the City of Flint, relied on the EPA to undertake the task of investigating complaints and fashioning the appropriate remedy.  Restatement of Torts, 2d § 324A(c).

283. If the investigation had been undertaken in a timely fashion, a violation of environmental law would have been detected and City of Flint would have been required to implement corrosion control treatment or to develop another remedy to prevent harm to Plaintiffs.

## COUNT III: Negligent Undertaking of the Duty to Warn the Public of Environmental Risks to Public Health

284. Plaintiffs adopt by reference and make a part hereof all previous paragraphs of this complaint as though fully set forth herein.

285. The EPA, in employing environmental safety experts such as Del Toral, undertook the task of providing the MDEQ with environmental safety technical advice and expertise regarding the consequences of using the Flint River as a primary drinking water source.

286. On June 24 and 25, 2015, Del Toral advised the EPA that the public's exposure to lead was "widespread" and that the environmental catastrophe facing Flint should not be concealed.  The citizens must be warned of the public health and safety risks and to conceal from the public the environmental risks and the failure to immediately warn them of the public health emergency "borders on criminal neglect.

287. Yet, the EPA concealed the environmental dangers and risks from the public and then failed to immediately warn the Flint residents of the public health emergency, resulting in prolonged injury to their person, their personal property and their real property.

288. Notwithstanding this advice from its' expert as to how to implement a mitigation of harm plan, the EPA remained silent when it should have spoken out and it knowingly permitted

and facilitated the MDEQ and City of Flint in the concealment of the environmental disaster identified by Del Toral. *See* Restatement of Torts, 2d § 324A(b).

289. The failure to warn Plaintiffs and the citizens of and water users in the City of Flint of the environmental disaster and ensuing cover-up significantly increased the harm to the Citizens of Flint for which the EPA is responsible. Restatement of Torts, 2d § 324A (a).

290. The conduct of Defendant's employees caused serious and irreparable harm to the residents of Flint. In addition to the harm to the residents, the prolonged exposure of the highly corrosive water without adequate anti-corrosive agents has irreparably damaged the approximately 18,000 sets of lead and copper plumbing throughout the City of Flint, all of which must now be replaced.

291. As a proximate result of Defendant's employees' conduct, Plaintiffs have experienced serious physical and emotional injury and severe and persistent pain and suffering due to their exposure to the toxic water, all currently and into the indefinite future.

292. Plaintiffs have also sustained property damage including irreparably damaged service line pipes as well as substantial loss in the value of their properties.

293. As a proximate result of Defendant's employees' deliberate indifference, Plaintiffs have experienced a seriously diminished quality of life, as well as loss of use and enjoyment of their property, and incurred substantial expense in coping with the inconvenience and disruption it has caused in their lives, including but not limited to the cost of bottled water, transportation and medical care.

294. As a direct, proximate and foreseeable cause of Defendant's employees' conduct, Plaintiffs have suffered extensive personal injuries and property damage.

295. Plaintiffs have been exposed to lead in their drinking water, which, in children, has been associated with increased likelihood of ADHD behavior, delinquent behaviors and arrests.

296. Lead is so harmful that, according to the EPA, "ingestion of lead can cause seizures, coma and even death."

297. The effects of lead exposure are long lasting.  The EPA itself, has stated, "[l]ead can accumulate in our bodies over time, where it is stored in bones along with calcium.  During pregnancy, lead is released from bones as maternal calcium and is used to help form the bones of the fetus.  This is particularly true if a woman does not have enough dietary calcium.  Lead can also cross the placental barrier exposing the fetus to lead.  This can result in serious effects to the mother and her developing fetus, including: reduced growth of the fetus [and] premature birth."

298. Lead is also harmful to adults.  The EPA stated that "[a]dults exposed to lead can suffer from: Cardiovascular effects, increased blood pressure and incidence of hypertension, [d]ecreased kidney function, [and] [r]eproductive problems (in both men and women)."

299. The World Health Organization explains that the direct medical costs of lead exposure include treatment for acute lead poisoning - typically chelation therapy - as well as the treatment of cardiovascular disease in adults who develop hypertension following lead exposure.

300. Flint's children, including Plaintiffs, have suffered the most disastrous consequences from lead exposure diminished potential over the entire course of their lives.  The World Health Organization states, "[t]hese costs are sometimes referred to as lost opportunity costs.  Using a conservative estimate, the decrease in intelligence attractable to each 1

μg/dl increase in blood lead level is 0.25 IQ points, and the decrement in lifetime economic productivity associated with lost IQ point is 2.4%.  When exposure to lead is widespread in a society, the aggregate loss of intelligence (and thus economic productivity) can be substantial."

301.   Notably, this estimate is conservative as it relates solely to lost earning potential and does not include costs related to special educational, medical, sociological, disability and occupational services, or long-term monitoring and treatment costs.

302.   According to an analysis of the economic losses attributable to lead exposure in 2009, "[t]he present value of Michigan's economic losses attributable to lead exposure in the 2009 cohort of 5-year-olds ranges from $3.19 billion (using U.S. blood lead levels) to $4.85 billion (using Michigan blood lead levels) per year in loss of future lifetime earnings."   Michigan Network for Children's Environmental Health, The Price of Pollution:  Cost Estimates of Environment-Related Childhood Diseases in Michigan (June 2010).  This report, of course, does not include estimates of the fallout from Flint's lead crisis.

303.   As a direct and proximate result of Defendant's employees' conduct, Plaintiffs' children have suffered specific, measurable damages in the form of lost earning potential.  They have also incurred damages in the form of required special educational, medical, sociological, occupational and disability services and related education assistance programs.

304.   In addition to the devastating health effects and lost economic productivity caused by lead exposure, Defendant's employees' conduct, as described above, has caused significant property damage.

305. The property damages sustained by Plaintiffs fall into three basic categories. **First**, the Plaintiff-owned pipes and appliances themselves have corroded, shortening the life span of all, and causing further damage when they break. **Second**, the corroded pipes and appliances remain a continuing source of lead and Legionella and other harmful organisms. Thus, pipes and appliances must be replaced or else remain a continuing source of harmful exposure. **Finally**, the value of Plaintiffs' real property has been substantially diminished as a result of the continuing need to use bottled water due to the questionable safety of Flint's water and existence of corroded pipes and appliances.

306. Although the City of Flint has been adding polyphosphate to its system to reduce the leaching of lead from its service lines, this will not render Flint's water safe because many of the pipes have become so corroded that not even phosphate will be able to fully encapsulate the surface of the pipes and prevent lead from leaching into the water supply.

307. Even with the addition of phosphate, Plaintiffs' pipes and appliances will remain corroded until replaced, and continue to be a source of lead and potentially Legionella. Solubilized and particulate lead and Legionella remain in portions of the piping system and appliances, and can become remobilized at any time, causing further damage and health effects.

308. The effect of corrosive water on residential and commercial piping and appliances is well understood. For example, a 2014 study by the Water Research Watershed Center stated, "[w]ith respect to the corrosion potential of YOUR drinking water, the primary concerns include the potential presence of TOXIC Metals, such as lead and copper; deterioration and damage to the household plumbing, and aesthetic problems such as: stained laundry, bitter taste, and greenish-blue stains around basins and drains."

309.   The Water Research Watershed Center has further explained that, "The cost of corrosion can be expensive.  Corrosion can impact you and your family's health, aesthetic quality of your water, waste money, and damage your household piping and fixtures."

310.   Not only does corrosion cause the "premature failure of household plumbing and plumbing fixtures," the Water Research Watershed Center has explained, corrosion also "decreases the efficiency of hot water heaters and may cause premature failure to the heater."  Moreover, residents have already reported damage to major appliances such as dishwashers and washing machines following Flint's decision to switch water sources.

311.   According to emails from Governor Snyder's office, the State estimates that replacing Residents' pipes alone could cost between $6,000 and $8,000 per household.  Other estimates of those replacement costs are far higher.

312.   Corroded pipes not only present a continuing health threat, they risk further damage to one's property because corrosion can result in deep pits in the pipe or tank walls that can eventually break, causing substantial water damage to homes and businesses.

313.   Although the City has begun replacing some City-owned pipes, this is far from sufficient to render Flint's water safe.  Sergio Kapusta, a fellow at NACE International, an industry organization that develops corrosion prevention and control standards in Houston, explained that "changing all the mains in the city will not really solve the problem for the homeowners" because the lead piping in these homes probably has been severely compromised. "The corrosion is not going away.  It's still there."

314.   Plaintiffs have been left to pay for the damage caused by Defendant's employees' negligence.  This has proven nearly impossible as many of the City's residents, including some Plaintiffs, survive on very little money.  To make matters worse, the Washington

Post has reported that, "many in Flint say banks are refusing to offer refinancing that could free up money to pay for the retrofitting, and that the costs are not covered by insurance.  The crisis has created a perfect storm to strip their houses of their remaining value, they say."

315. Replacing the piping and affected appliances in each home and business is the only way to guarantee that a home or business will be unaffected by corrosion and lead.  The cost of such replacements will range into the tens of thousands, if not more, per structure.

316. Moreover, the problems associated with Flint's water have had and are having a significant impact on residential and commercial property values and rental rates in the City.  As Daniel Jacobs, an executive with Michigan Mutual explained, "[t]he tragedy is an already depressed community is now likely to see housing values plummet not only because of the hazardous water, but because folks cannot obtain financing."

317. Certain banks and mortgage companies have refused to make loans, unless the borrower establishes that its water is potable.  A Wells Fargo & Co. spokeswoman said it is reviewing government lending guidelines: "[u]ntil [water] testing and potability is affirmed, it will be difficult to lend," said the spokeswoman, who said such difficulties would apply to all lenders.  Representatives from Bank of America and J.P. Morgan similarly have acknowledged requiring verification of potable water to provide financing to Flint's residents.  Lenders claim their hands are tied.  As the Federal Housing Administration, which backs loans to less-creditworthy borrowers, explained, government regulations require "a continuing and sufficient supply of safe and potable water" to provide home financing.

318.   This creates a true catch-22.  Despite having switched back to its water source to the DWSD, the current extent of corrosion in Flint renders the water unsafe because the pipes and appliances will remain corroded and sources of lead until they are replaced. However, residents cannot obtain financing to replace their pipes and appliances until the water is deemed safe.

319.   EPA Region 5 knew there were corrosion control and other contamination issues with the City of Flint Water System that presented imminent and substantial endangerment to human health and they failed to act appropriately and timely, resulting in permanent damage to the persons and property of the Plaintiffs.

### COUNT IV:  Negligent Infliction of Emotional Distress

320.   Plaintiffs incorporate by reference and make a part hereof all previous paragraphs as though they were fully set forth herein.

321.   Defendant EPA owed Plaintiffs a duty to exercise reasonable care.

322.   As alleged herein, Defendants failed to exercise reasonable care, which had the direct and foreseeable result of causing Plaintiffs severe emotional distress.

323.   EPA Region 5 knew there were corrosion control and other contamination issues with the City of Flint Water System that presented imminent and substantial endangerment to human health and they failed to act appropriately and timely, resulting in permanent damage to the persons and property of the Plaintiffs.

### RELIEF REQUESTED

WHEREFORE, Plaintiffs respectfully request the following relief:

A.   That judgment be entered for Plaintiffs against Defendant EPA for personal and property damages sustained as a direct and proximate cause of Defendant's

employees' actions and/or inactions, compensatory damages for costs associated with necessary diagnostic medical intervention, treatment and assessment, psychological intervention and counseling and future medical care, in an amount sufficient to compensate Plaintiffs, but in any event in an amount in excess of $75,000.

B.  That Plaintiffs recover interest as permitted by law.

C.  That Plaintiffs recover their costs of the suit, including attorneys' fees, and costs as permitted by law.

D.  Any such other and further relief as is just and proper under the circumstances.

August 31, 2018                            Respectfully Submitted,

                                           WASHINGTON LEGAL

                                           */S/Valdemar L. Washington*
                                           VALDEMAR L. WASHINGTON P27165
                                           Attorney for Plaintiffs
                                           718 Beach Street/P.O. Box 187
                                           Flint, MI 48501-0187
                                           810.407.6868
                                           VAL@VLWLEGAL.COM


## JURY DEMAND

Plaintiffs make Demand for Trial by Jury in this cause as to those issues so triable.

August 31, 2018                            Respectfully Submitted,

                                           WASHINGTON LEGAL

                                           */S/Valdemar L. Washington*
                                           VALDEMAR L. WASHINGTON P27165
                                           Attorney for Plaintiffs
                                           718 Beach Street/P.O. Box 187
                                           Flint, MI 48501-0187
                                           810.407.6868
                                           VAL@VLWLEGAL.COM